UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| REBECCA A. JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:12CV1633 JAR/FRB |
| | ) | |
| CAROLYN W. COLVIN,[1] Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on plaintiff Rebecca A. Jones's appeal of an adverse decision of the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

## I.   Background and Procedural History

On November 18, 2009, plaintiff Rebecca Jones ("plaintiff") filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability due to fibromyalgia,[2] migraines, arthritis, and joint,

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should therefore be substituted for Michael J. Astrue as the defendant in this case. No further action needs to be taken to continue this suit by reason of the last sentence of 42 U.S.C. § 405(g).

[2]"Fibromyalgia, a chronic condition recognized by the American College of Rheumatology (ACR), is inflammation of the fibrous and connective tissue, causing long-term but variable

calf, leg, back and hand pain. (Administrative Transcript ("Tr.") 127-39). Plaintiff's claims were denied, (Tr. 59-63), and she timely requested a hearing before an administrative law judge ("ALJ"). (Tr. 66). On February 24, 2011, a hearing was held before an ALJ (Tr. 32-50), and the ALJ issued an unfavorable decision on March 3, 2011. (Tr. 7-21). Plaintiff sought review of the ALJ's decision with defendant agency's Appeals Council, which denied her request for review on August 2, 2012. (Tr. 1-6). The ALJ's decision thus stands as the Commissioner's final decision subject to review in this Court. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. Plaintiff's Testimony

Plaintiff testified that she was 62 years of age, and had completed the 12th grade and one year of college. (Tr. 34). Plaintiff testified that she had worked at a casino first as a housekeeper/cleaner, and then later in customer service. (Tr. 34-35). Plaintiff also described her past work in a laundry facility, as a cashier/server, as a mail handler for the U.S. Postal Service, several positions as a retail clerk, and in data entry. (Tr. 35-39).

---

levels of muscle and joint pain, stiffness, and fatigue." Brosnahan v. Barnhart, 336 F.3d 671, 672 n. 1 (8th Cir. 2003). "Diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests. According to the ACR's 1990 standards, fibromyalgia is diagnosed based on widespread pain with tenderness in at least eleven of eighteen sites known as trigger points. Treatments for fibromyalgia include cold and heat application, massage, exercise, trigger-point injections, proper rest and diet, and medications such as muscle relaxants, antidepressants, and anti-inflammatories." Id.

Plaintiff testified that she had intermittent neck pain that traveled from her neck to her head and triggered daily migraine headaches that lasted from 15 minutes to one hour. (Tr. 39). She testified that she took medication, which seemed to help. (Tr. 40). She testified that she had mid and lower back pain. (Tr. 39). Plaintiff testified that, in 2007, she was bitten by a spider in the area of her spine, and underwent a procedure during which a large incision was made to drain the site. (Tr. 39, 43). She testified that she had daily pain in her arms, legs, knees, shoulders and "sometimes in my hand." (Tr. 40). Plaintiff testified that she was undergoing pain management treatment and had been told that she had chronic pain syndrome. (Tr. 40-41).

When asked to describe her daily pain, plaintiff testified "[i]n the mornings when I get up the pain starts, it usually starts with the headache and it like intensifies . . .". (Tr. 42). She testified that the pain began in her forehead and went around the side of her head, worse at the temples, and traveled down her neck, shoulders, back, arms, and legs, making her legs feel like "logs" that were too heavy to move. (Id.) She testified that she had tingling in her hands and had trouble opening jars. (Id.) Plaintiff testified that she was "in pain every single day and at night it's worse. I toss and turn until I finally go to sleep when the medicine kicks in." (Id.) Plaintiff testified that she woke during the night and could not go back to sleep "but then the pain is already gone because the medicine has set in." (Tr. 42-43).

When asked whether she needed to lay down during the day, plaintiff testified that doing so was difficult because she could not "lay on either side because of where the incision from the holes like that when they did it in my back was about that big." (Tr. 43). It was noted that plaintiff had indicated a span of about three inches. (Id.) She testified that the site was still not completely well and that she was not sitting back against the chair because "it doesn't feel right on that spot." (Id.)

Plaintiff testified that she could sit for 15 minutes depending on the type of chair. (Id.) She testified that she did not stand a lot, and leaned against counters when waiting in line at a store. (Tr. 43-44). When asked how she did going up and down steps, plaintiff replied: "[s]ince there's really no steps I move from where I was before, I fell down those steps once and I just passed out and I didn't realize I had fell until I came to but I don't have to do steps anymore so - - ." (Tr. 44). She testified that, when walking from her bed to the kitchen, she had to stop because she became lightheaded. (Id.)

Plaintiff and her attorney then had the following exchange:

Q. (by counsel): In, in addition to the, the tingling in your hands do you have any tremors in your hands?

A. (by plaintiff): What is that?

Q.      Will your hands kind of shake?

A.      I don't even know what that is from, I don't.

Q.      But is that something that happens?

A.      That happens after, when I started on the
        medication and all the pain and I was like
        that in your office the first time I came in
        also.

        (Id.)

        Plaintiff testified that her medications caused no side
effects, but that she used ice packs to help her medication work
faster.  (Tr. 44-45).

        Plaintiff testified that she did not live alone, and was
able to make her bed.  (Tr. 45).  She testified that she did not
"make cleaning, I don't clean the bathroom or nothing like that.
I use paper plates because I can't stand that long at the sink
washing dishes because it's like - - ."  (Id.)  She took showers
because it was difficult to rise from a bathtub, but was
independent with dressing herself.  (Id.)  She testified that
someone else did her grocery shopping for her.  (Tr. 46).

    B.  Medical Records

        Records from Christian Hospital indicate that plaintiff
underwent incision and drainage of an abscess on her back on June
20, 2007.  (Tr. 469-72).  On September 8, 2007, she presented to
the emergency room at Christian Hospital with complaints of cough
and headache, and was diagnosed with bronchitis.  (Tr. 458-65).  On
January 24, 2008, she presented to the emergency room with
complaints of cough, sneezing and sore throat, and was diagnosed
with pharyngitis and cough.  (Tr. 450-57).  On February 12, 2008,
chest x-ray revealed no active disease.  (Tr. 448).  On March 28,

2008, she was treated for fracture of her left great toe. (Tr. 441-45). Physical examination was normal, with the exception of painful flexion of the left great toe. (Tr. 441).

On May 18, 2008, plaintiff presented to the emergency room at Christian Hospital with complaints of pain in her shoulders, arms, head and neck, which she attributed to an incident during the performance of her job as a postal carrier. (Tr. 429). To describe the incident, plaintiff stated that, while lifting 50 to 70 pound mail sacks, she "popped a muscle" in her right upper shoulder/chest, experienced pain, and was unable to raise her arms above her head. (Tr. 431). She was given medication and discharged. On August 7, 2008, plaintiff was seen in the emergency room with complaints of pain in her legs and arms, across her shoulder blade, and on her neck. (Tr. 408). Plaintiff stated that the symptoms had persisted for three days, and were better in the morning and worse at night. (Tr. 410). She was diagnosed with muscle pain, given medication, and discharged. (Tr. 418-19). On August 29, 2008, she was seen for treatment of a laceration to her left forearm. (Tr. 403).

On November 17, 2008, plaintiff presented to the emergency room at Christian Hospital with complaints of stiff shoulders "from stress," pain in the entire body and head, which only happened at night. (Tr. 396). Plaintiff stated she had been unable to sleep for three days, rubbed her hands together to "get the blood back flowing." Examination was normal. (Tr. 399-400).

Plaintiff was diagnosed with muscle pain and sinusitis, given medication, and discharged. (Tr. 400). On July 26, 2009, she was seen for a gradual onset, typical headache with light sensitivity and nausea, and breathing problems. (Tr. 386). She denied neck pain, sinus symptoms, and lateralizing weakness. (Tr. 391). Examination was normal. (Id.)

On July 30, 2009, plaintiff was seen by Yolanda E. Bledsoe, M.D., with complaints of diffuse muscle pain in her arms and legs that had persisted for about one year. (Tr. 227). Plaintiff reported having headaches and taking medication, which helped. (Id.) Plaintiff reported that financial problems and problems at home were causing increased stress. (Id.) Plaintiff also complained of pain upon urination. (Id.) Examination was normal, revealing normal musculature and no skeletal tenderness, joint deformity, edema or skin discoloration. (Tr. 227). Dr. Bledsoe diagnosed acute muscle weakness, acute headache, and urinary tract infection. (Tr. 227-28). Plaintiff was given Midrin,[3] Quinapril,[4] and Macrobid.[5] (Id.)

---

[3]Midrin, a combination of isometheptene mucate, dichloralphenazone, and acetaminophen, is used to relieve migraine and tension headaches. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601064.html

[4]Quinapril, also known as Accupril, is used to treat hypertension. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692026.html

[5]Macrobid, or Nitrofurantoin, is used to treat urinary tract infection. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682291.html

Plaintiff returned to Dr. Bledsoe on August 27, 2009 with complaints of diffuse body aches for the last month, pain in her upper shoulder and legs, daily migraines, and a rash. (Tr. 225). Plaintiff reported using Advil, which helped. (Id.) Examination was normal, with the exception of an observed rash. (Id.) Dr. Bledsoe diagnosed dermatophytosis, chronic migraine, and acute "Joint Derangement, Unspecified, Multiple Sites" and advised plaintiff to use Lotrisone cream,[6] and take Mobic,[7] Amitriptyline,[8] Quinapril, and Midrin. (Id.)

Plaintiff returned to Dr. Bledsoe on October 15, 2009 and reported having migraines. (Tr. 223). Plaintiff reported that she "started amitryptyline and headaches stopped" and "then stopped the amitryptoline [[sic] and headaches returned." (Id.) Plaintiff reported she was using Midrin for severe headaches only. (Id.) Plaintiff reported daily muscle pain and pain bilaterally in her arms and legs, and stated that Mobic did not relieve her symptoms. (Id.) Plaintiff also reported crusting of her left eye for the past two months. (Tr. 223). Examination was normal, revealing

---

[6]Lotrisone cream, or Clotrimazole, is used to treat yeast infections of the vagina, mouth, and skin such as athlete's foot, jock itch, and body ringworm. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682753.html

[7]Mobic, or Meloxicam, is used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis and rheumatoid arthritis. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601242.html

[8]Amitriptyline, also known as Elavil, is used to treat symptoms of depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html

normal musculature and normal extremities, with no tenderness, joint deformity, swelling or skin discoloration.  (Id.)  Dr. Bledsoe diagnosed acute muscle discomfort, migraine, and conjunctivitis.  (Id.)  Dr. Bledsoe prescribed Ciloxan,[9] and recommended that plaintiff use Lotrisone cream and take Amitryptyline, Midrin, Quinapril, and Mobic.  (Id.)

On November 30, 2009, plaintiff returned to Dr. Bledsoe with complaints of diffuse joint pain and migraines.  (Tr. 221). Examination was normal.  (Id.)  Dr. Bledsoe diagnosed plaintiff with acute body aches and chronic migraine, and prescribed Topamax,[10] Flexeril,[11] and Ultram.[12]  (Id.)

On January 3, 2010, plaintiff was seen in the emergency room at Christian Hospital with complaints of "eyes stuck together for two days."  (Tr. 375).  She had no other complaints.  (Tr. 380).  She was diagnosed with a cold.  (Tr. 385).

---

[9]Ciloxan, or Ciprofloxacin, is used to treat bacterial infections of the eye.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605005.html

[10]Topamax, or Topiramate, is used alone or with other medications to treat certain types of seizures in people who have epilepsy. Topiramate is also used to prevent migraine headaches, but not to relieve the pain of migraine headaches when they occur.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697012.html

[11]Flexeril, or Cyclobenzaprine, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html

[12]Ultram, or Tramadol, is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a695011.html

The record indicates that plaintiff was seen on February 15, 2010 by Charles Mannis, M.D. for an orthopedic evaluation at the request of defendant Agency. (Tr. 235-37). Plaintiff reported problems with her hands and fingers with pain going up her arms to her neck, and then down her back into her legs. (Tr. 235). Plaintiff complained of pain in both hands and wrists when she tried to grip or twist, and that, on a daily basis, the pain went up her arms, her neck and into her head and then down her back into her legs. (Id.) Plaintiff reported pain in various places with all activities. (Id.) Plaintiff reported that raising her arms caused pain, and bending and kneeling hurt her knees, and that she was unable to clean or cook like she used to. (Id.) Plaintiff reported that she had seen a physician and undergone blood tests which were "okay." (Tr. 235). Plaintiff stated that she had been given various medications which "just make her sleepy." (Id.) She reported taking Quinipril, Aspirin, Topiramate, Meloxicam, Amitriptyline, Tramadol and Ranitidine. (Tr. 236).

Dr. Mannis noted that plaintiff's history was "somewhat vague" and that plaintiff's symptoms had been "present for an indeterminate period" and had gone from intermittent to more regular. (Tr. 235). Dr. Mannis noted that plaintiff's symptoms were not well-defined in terms of location or character and that, while plaintiff complained of tenderness just to touch in various areas, these symptoms appeared to be quite vague. (Tr. 235-36).

Upon examination, Dr. Mannis noted that plaintiff was

well developed and in no acute distress.  (Tr. 236).  Dr. Mannis observed that plaintiff dressed and undressed without assistance or difficulty; arose from a chair and examining table without apparent difficulty, had a normal gait and station with no limp or list, and used no ambulatory aids.  (Id.)  She was able to walk on her toes but not on her heels, and was able to tandem walk.  (Id.)  She felt that squatting was uncomfortable, and was noted to have a tremor in her right hand.  (Id.)  Plaintiff exhibited essentially complete motion of her neck in all planes, and complete motion of her shoulders, elbows, hands and wrists.  (Tr. 236).  There was no swelling, clubbing, or discoloration in her hands, she had full extension and flexion of all fingers, and she was able to oppose her thumb to all fingers.  (Id.)  Grip strength was 4/5 bilaterally, and deep tendon reflexes were 2+ and symmetrical in the upper extremities.  (Id.)

Dr. Mannis noted that plaintiff's lower back was unremarkable, and that plaintiff exhibited full motion of the lumbar spine, hips, knees and ankles.  (Id.)  Dr. Mannis noted that, while plaintiff complained of diffuse tenderness to her knees, there was no definitive joint line pain of either knee. (Tr. 236).  Sensory examination was "grossly normal" but was "slightly diminished over the dorsum of each foot."  (Id.)

Dr. Mannis's clinical impression was "[m]ultiple complaints of extremity pain."  (Id.)  Dr. Mannis noted that the clinical findings were not definitive, and there were no obvious

objective clinical abnormalities noted from an orthopedic standpoint. (Tr. 236). Dr. Mannis wrote that there did "not appear to be specific work restrictions that would be appropriate based upon the absence of objective clinical findings on evaluation." (Tr. 237).

On March 29, 2010, plaintiff underwent EMG and Nerve Conduction Velocity Examination at Christian Hospital for evaluation of complaints of pain, numbness and tingling of the upper and lower extremities. (Tr. 372). The impression was normal nerve conduction study of the upper and lower extremities. (Id.)

On April 12, 2010, plaintiff underwent MRI of the lumbar spine which revealed moderate central spinal stenosis at L4-L5, foraminal narrowing of L4-L5 left more than right, disk bulging and facet osteoarthritis at L5-S1, and degenerative disk disease at L3-L4. (Tr. 369).

On May 21, 2010, plaintiff saw Dr. Bledsoe with complaints of "all over body pain, headaches and muscle spasms." (Tr. 276). She reported sleeping better with Amitriptyline, and stated that she had not seen the rheumatologist. (Id.) Upon examination, Dr. Bledsoe noted that physical examination was normal, and that plaintiff had normal musculature, no skeletal tenderness or joint deformity, normal extremities, and no swelling or skin discoloration. (Tr. 277). Dr. Bledsoe's assessment was muscle spasm, hypertension, and malaise and fatigue. (Id.)

Osteoporosis screening performed on May 27, 2010 at

Northwest Healthcare was normal.  (Tr. 262, 366).

On June 9, 2010, plaintiff presented to the emergency room at Christian Hospital with complaints of a cough, sneezing, and phlegm.  (Tr. 357).  It is noted that plaintiff's past medical history included fibromyalgia and migraine headache.  (Tr. 360).  She was diagnosed with bronchitis.  (Tr. 361).

On June 10, 2010, plaintiff saw Dr. Bledsoe with complaints related to bronchitis, blurred vision, and migraines, which she stated she was having "almost every other day."  (Tr. 260).  Examination was normal.  (Tr. 261).  Dr. Bledsoe's assessment was blurred vision and headache.  (Id.)

On June 18, 2010, plaintiff saw Dr. Bledsoe for a physical examination, and also complained of shortness of breath and recurrent migraines.  (Tr. 253).  Examination was normal, and plaintiff was noted to be well developed and in no acute distress.  (Id.)

On July 17, 2010, plaintiff presented to the emergency room at Christian Hospital and stated: "I'm kinda like disoriented, I have fibromyalgia and my legs hurt."  (Tr. 340).  Plaintiff complained of generalized body aches and weakness, and stated that her symptoms started the previous day.  (Tr. 342).  She denied headache, among other symptoms.  (Tr. 348).  Examination was normal.  (Tr. 349).

On September 17, 2010, plaintiff saw Dr. Bledsoe with complaints of daily migraine headaches and diffuse body pain.  (Tr.

250).  Plaintiff reported having pain despite taking Topamax, stating that she had "sharp pain at top of head every other day that last for about 5 min." (Id.)  Examination was normal.  (Tr. 251).  Dr. Bledsoe diagnosed migraine, backache, and "myalgia and myositis"[13] not otherwise specified, stating "I believe patient may be developing fibromyalgia."  (Id.)  She advised plaintiff to follow up with a rheumatologist and return in three to four months.  (Id.)  Plaintiff was referred to pain management.  (Tr. 314).

On September 26, 2010, plaintiff presented to the emergency room at Christian Hospital with complaints of coughing, sneezing, post nasal drip, and right-sided chest pain with coughing.  (Tr. 327, 331).  She reported diffuse muscle pain and chronic headaches, but "both of these are unchanged from what her normal symptoms are."  (Tr. 331).  Examination was normal, and plaintiff was given medication and discharged.  (Tr. 332-34).

On September 30, 2010, plaintiff was seen by Josh Johnston, M.D. and Rahul Rastogi, M.D., at Barnes Jewish Hospital for a "new patient health risk screening."  (Tr. 295).  Plaintiff reported difficulty walking, getting dressed, falling, bathing/grooming, memory, eating, speaking, and activities of daily living including cooking, cleaning, shopping and driving.  (Id.)  Plaintiff reported generalized body pain that she described as

---

[13]Myalgia means muscular pain.  STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000), available at STEDMAN'S 263770 (Westlaw). Myositis means inflammation of a muscle.  STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000), available at STEDMAN'S 266550 (Westlaw).

constant and aching.  (Id.)  Upon examination, plaintiff had diffuse tenderness to palpation above and below her diaphragm, slight loss of normal lordosis in her neck, tenderness at C7-T1 midline, full range of motion in the thoracic spine and lumbar spine with full range of motion, and normal stance and gait.  (Tr. 296).  It is not indicated whether plaintiff exhibited any positive trigger points.  (Tr. 295-97).  Plaintiff was given Duloxetine,[14] and was advised to stop taking Tramadol but continue her other pain medications; to begin a home exercise program; to undergo psychological evaluation and counseling; and return in one month. (Tr. 297).

On October 29, 2010, plaintiff was seen by Beverly Field, Ph.D., at Barnes Jewish Hospital at Dr. Rastogi's request for psychological evaluation related to chronic diffuse pain and headaches.  (Tr. 280-82).  Plaintiff reported a long history of migraine headaches and a history of arthritis, and also reported having been diagnosed with fibromyalgia two years ago.  (Tr. 280). She described her pain as continuous, and worse at night.  (Id.) Plaintiff reported that lifting, bending, lying down, weather/temperature changes, standing, sitting, and stress/worry caused her pain to worsen.  (Id.)  She reported that, until the addition of Cymbalta, her medications had no effect.  (Id.)  She

---

[14]Duloxetine, also called Cymbalta, is used to treat depression and generalized anxiety disorder, and is also used to treat pain resulting from diabetic neuropathy and fibromyalgia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html

reported that ice and Cymbalta made it better, but heat and rest had no effect. (Tr. 280). Plaintiff reported that the pain was located at her head and temples, neck, shoulders, arms, hands, fingers, mid back, low back, and bilateral lower extremities. (Id.) She described the pain as "throbbing, shooting, stabbing, hot/burning, aching, heavy, splitting, tiring/exhausting, sickening, fearful, punishing/cruel." (Id.)

Plaintiff reported that she was not working, and had last worked full time in 2008 and part time in July of 2010. (Id.) She reported that she had attempted to do some temporary work, but stated that she was unable to continue because of pain. (Tr. 281). She reported that her initial social security disability claims were denied, and that she had reapplied. (Tr. 280).

Plaintiff reported that she lived with her former daughter-in-law, her 18-year-old grandchild, and her 20-year-old son. (Id.) Plaintiff reported that, on an average day, she did light housework and sat around, and walked for five or ten minutes around the perimeter of the back yard. (Id.) Plaintiff reported that she attended church on Sunday, but otherwise remained at home. (Id.) She reported that she laid down at 8:00 p.m. and watched television until she fell asleep, was able to sleep through the night, and felt rested when she rose at 6:00 a.m. (Tr. 281).

Examination was normal. (Id.) Dr. Field noted that plaintiff had very limited daytime activity, that it was quite likely plaintiff was deconditioned, and that the lack of meaningful

activity may well increase her focus on pain. (Id.) Dr. Field recommended that plaintiff attend physical therapy and do general conditioning to help with the management of her chronic conditions. (Tr. 281-82). Dr. Field noted that plaintiff may be eligible for a scholarship through a local YMCA where she could do water exercise, and noted that she had provided plaintiff with several telephone numbers. (Id.) Dr. Field noted that plaintiff was an excellent candidate for the STEPP program, a multidisciplinary pain management program focusing on general conditioning, proper body mechanics, how to pace daily activities, and coping skills. (Tr. 282). Dr. Field noted that, because physical therapy was not included on plaintiff's insurance plan, she would need to attend on scholarship. (Id.) Dr. Field assessed plaintiff's Global Assessment of Functioning ("GAF")[15] as 68, indicative of mild symptoms. (Tr. 281).

On November 20, 2010, plaintiff presented to the emergency room at Christian Hospital with complaints of a rash on her arms, a crusty right eye, a sore throat, and post nasal drip. (Tr. 316). She was diagnosed with conjunctivitis, dermatitis, and

---

[15]The Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). GAF scores of 61 to 70 represent mild symptoms with a reasonably good level of functioning. Id. at 32; see also Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (internal citations omitted) ("[A] GAF score of 65 ... reflects 'some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well, has some meaningful interpersonal relationships.'")

an upper respiratory infection.  (Tr. 323).

On March 1, 2011, plaintiff was seen by Dr. Rastogi at Barnes Jewish Hospital with complaints of headache pain, back pain, and bilateral shoulder, arm and neck pain.  (Tr. 478).  It was noted that she had a history of "pain everywhere for many years." (Id.)  Plaintiff's "Active Problems" were noted as allergies, esophageal reflux, fibromyalgia, hypertension, osteoporosis, and sinusitis.  (Tr. 479).  Plaintiff reported that she was retired from her most recent work as a postal worker, and stated that she was single and living with a boyfriend.  (Id.)

Dr. Rastogi's review of symptoms revealed that plaintiff was tender to palpation along her entire spine, and revealed muscle spasm in the cervical/trapezius area, and joint tenderness of the bilateral hips and knees.  (Id.)  Dr. Rastogi diagnosed "Other Chronic pain," diffuse body and joint pain, fibromyalgia, cervical spondylosis without myelopathy, cervical degeneration, lumbosacral spondylosis without myelopathy, intervertebral disc displacement, thoracolumbar degeneration, anxiety, depression, and insomnia. (Tr. 479-80).  Dr. Rastogi recommended that plaintiff increase her Cymbalta dosage and continue other medications, and to exercise. (Tr. 480).

C.   Other Evidence

In a January 6, 2010 Function Report, plaintiff reported that her diabetic granddaughter lived with her, and that plaintiff assisted her with taking medication and preparing meals.  (Tr.

195).  She reported that her granddaughter helped her cook sometimes, "but mostly I do mostly everything I can do as possible. It is hard and painful."  (Id.)  Plaintiff reported that she prepared meals daily, even though she did not always cook a complete meal and that cooking was difficult.  (Tr. 196).  She wrote that she drove a car to attend church and see the doctor; that she attended church on Sundays, and shopped once per month for approximately 2 hours, but spent most of her time at home because she was "a loner."  (Tr. 197-98).  She wrote that she could lift 20 to 30 pounds, and had difficulty squatting, bending, standing too long, reaching, walking, sitting, and kneeling.  (Tr. 199).

### III.    The ALJ's Decision

The ALJ determined that plaintiff had the severe impairments of disorders of the spine, history of migraine activity, and hypertension, but did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  (Tr. 12, 15).  The ALJ determined that plaintiff retained the residual functional capacity (also "RFC") to perform the full range of light work, and could perform her past relevant work as a cafeteria worker, mail handler, customer service clerk, and retail store clerk.  (Tr. 15-16).  The ALJ concluded that plaintiff was not under a disability, as defined in the Act, at any time through the date of his decision.  (Tr. 17).

### IV.    Discussion

To be eligible for benefits under the Social Security

Act, plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Services</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines a disabled individual in terms of the effect of a physical or mental impairment upon the individual's ability to function in the workplace. <u>See</u> 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act provides for disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." <u>Id.</u> It further specifies that a person must be both unable to do her previous work and unable, "considering [her] age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); <u>Heckler v. Campbell</u>, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner follows a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen</u>, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity. If the

claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then she is not disabled. If the claimant's impairment is severe, the Commissioner then determines whether it meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. <u>Pearsall</u>, 274 F.3d at 1217, <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young o/b/o Trice v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995), <u>citing</u> <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find  adequate to support the conclusion. <u>Briggs v.</u>

<u>Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ;

2. The plaintiff's vocational factors;

3. The medical evidence from treating and consulting physicians;

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5. Any corroboration by third parties of the plaintiff's impairments;

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

<u>Stewart v. Secretary of Health & Human Services</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." <u>Groeper v. Sullivan</u>, 932 F.2d 1234, 1237 (8th Cir. 1991); <u>see also</u> <u>Briggs</u>, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003) (citing

Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)); see also Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted) ("[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision").

In the case at bar, plaintiff argues that the ALJ failed to properly consider all of her severe medically determinable impairments at Step 2, and that the ALJ's RFC and credibility determinations are not supported by substantial evidence on the record as a whole. In response, the Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole. The undersigned will first address plaintiff's arguments concerning the ALJ's credibility and RFC determinations.

A.   Credibility and RFC Determinations

In the case at bar, the ALJ concluded that plaintiff retained the RFC to perform a full range of light work. The ALJ wrote that, in determining plaintiff's RFC, he had considered the credibility of plaintiff's subjective allegations of symptoms precluding all work in accordance with 20 C.F.R. §§ 404.1529 and 416.929, and SSRs 96-4p and 96-7p. In his decision, after noting several inconsistencies detracting from plaintiff's credibility, the ALJ concluded that plaintiff's subjective allegations were not fully credible. The undersigned will first consider plaintiff's arguments that substantial evidence fails to support the ALJ's

credibility determination.  See Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217) (before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints).

Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of her alleged physical impairment.  Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993).  Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect.  Polaski at 1321-22.  In Polaski, the Eighth Circuit addressed this difficulty and established the following standard for the evaluation of subjective complaints:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

Id. at 1322.

Although the ALJ is not free to accept or reject the claimant's subjective complaints based upon personal observations

alone, he may discount such complaints if there are inconsistencies in the evidence as a whole.  Id.  The "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003).  When an ALJ explicitly considers the Polaski factors and discredits a claimant's complaints for a good reason, that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).  The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject.  Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

The ALJ in this case first noted that he considered significant "the relative lack of more clinically significant findings on examinations conducted, said findings as heretofore discussed." (Tr. 16).  Although an ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility.  See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).  As the Commissioner correctly notes, the record supports the ALJ's observation.  Physical examination repeatedly revealed normal gait and station and full range of motion and strength, and no abnormalities, motor deficits, or sensory deficits, demonstrating that pain was not disabling as

alleged.  (Tr. 221, 225, 227, 236-37, 254-55, 261, 296, 321, 327, 332, 349, 351, 361, 377, 399, 411, 479); Johnson v. Chater, 108 F.3d 942, 947 (8th Cir. 1997) (the mere fact that working may cause pain or discomfort does not mandate a finding of disability; the issue is whether pain precludes the performance of any form of substantial gainful activity).

Despite plaintiff's allegations of fibromyalgia, plaintiff's medical treatment providers failed to note that plaintiff exhibited any positive trigger points upon examination. (Tr. 221, 225, 227, 261, 277, 321, 349, 351, 361, 400).  An MRI of plaintiff's brain, an electromyography, and a bone scan were negative. (Tr. 262-67, 361, 372-73).  Despite plaintiff's reports of debilitating pain that precluded all work, when she presented for medical treatment, her treatment providers repeatedly observed her to be in no distress, (Tr. 236, 255, 281, 296, 332, 342, 344, 349, 360, 376-77, 381, 391, 399, 405, 411, 479), and advised her to engage in regular physical exercise.  (Tr. 281-82, 297, 480).

The ALJ also noted that no treating or examining source opined that plaintiff was disabled from all work activity. Plaintiff argues that the ALJ should not have considered this in assessing her credibility because physician opinions that a claimant is disabled are not the types of medical opinions that the Commissioner credits.  However, the ALJ did not rely exclusively or on this factor, and it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of

symptoms precluding all work.  <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017-18 (8th Cir. 1996); <u>see</u> <u>also</u> <u>Brown v. Chater</u>, 87 F.3d 963, 965 (8th Cir. 1996) (lack of significant medical restrictions imposed by treating physicians supported ALJ's decision denying benefits); <u>Smith v. Shalala</u>, 987 F.2d 1371, (8th Cir. 1993) (lack of significant medical restrictions inconsistent with allegations of disabling pain).

The ALJ also found that plaintiff's reported ability to engage in a variety of daily activities was inconsistent with her subjective complaints.  The ALJ noted that plaintiff reported that she assisted with her diabetic granddaughter's care, prepared meals, did certain household chores, drove a car, shopped in stores, used a computer, and attended church services.  The ALJ noted that these activities tended to suggest a functional capacity inconsistent with her subjective allegations of pain and other symptoms precluding all work.  <u>See</u> <u>Medhaug v. Astrue</u>, 578 F.3d 805, 816 (8th Cir. 2009) (activities such as cooking, household chores, shopping, driving and walking are inconsistent with complaints of disabling pain).  The record also indicates that plaintiff stated that she stayed home most of the time because she was "a loner" (as opposed to disabling pain or other symptoms) (Tr. 197-98); that she stopped working in November of 2008 because "the job ended" (Tr. 175); and told some of her medical treatment providers that she had "retired." (Tr. 296, 311, 478-79).  While not alone dispositive of the issue of plaintiff's credibility, such evidence is inconsistent

with plaintiff's allegations of totally disabling pain and other symptoms. <u>Depover v. Barnhart</u>, 349 F.3d 563, 566 (8th Cir. 2003) (Claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that this suggested that his impairments were not as severe as he alleged).

The ALJ also considered plaintiff's poor work history as detracting from her credibility, noting that her earnings record showed only nominal earnings. Indeed, review of plaintiff's earnings record reveals that, even before plaintiff's alleged onset date, her earnings were nominal and widely varied: for example, while she earned $10,540.22 in 1997, during the next three consecutive years she earned $2,764.13 (1998), $5,264.35 (1999), and $4,112.48 (2000). (Tr. 142). The remainder of plaintiff's earnings record shows similar fluctuations and low earnings even before her alleged onset date. <u>See</u> <u>Id.</u> As the ALJ observed, such a work history detracts from a finding that disability is the reason plaintiff is not working. <u>See</u> <u>Buckner v. Astrue</u>, 646 F.3d 549, 558 (8th Cir. 2011) (a sporadic work history prior to the claimant's alleged date of onset indicated that "he was not strongly motivated to engage in meaningful productive activity even prior to the alleged onset of disability and weigh[ed] against his credibility in assigning reasons for not working"); <u>see</u> <u>also</u> <u>Pearsall</u>, 274 F.3d at 1218 (citation omitted)(a poor work history detracts from a claimant's credibility).

The ALJ also considered it significant that plaintiff had

applied for and received unemployment compensation benefits, noting that a "claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold herself out as available, willing and able to work." (Tr. 16). This is consistent with Eighth Circuit precedent holding that applying for unemployment benefits is some evidence, though not conclusive evidence, to negate a claim of disability. Johnson, 108 F.3d at 180-81 ("[A] claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold himself out as available, willing, and able to work"). Plaintiff alleges error, arguing that, due to her age and education level, she could retain the ability to perform sedentary work and still be found "disabled." Plaintiff's argument is not compelling. As the Commissioner correctly notes, plaintiff told the Commissioner that she was totally disabled from all work, but she told another agency that she was ready, willing and able to work. It was not error for the ALJ to consider that plaintiff's inconsistent statements negatively impacted her credibility. See Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (a claimant's inconsistent statements detract from his credibility).

Plaintiff alleges error in the ALJ's failure to discuss her prescribed medications. As noted in the above summary of the medical information of record, plaintiff was regularly prescribed various medications. However, the ALJ's failure to specifically discuss plaintiff's prescribed medications does not demand

reversal.  An ALJ is not required to discuss each <u>Polaski</u> factor as long as "he acknowledges and considers the factors before discounting a claimant's subjective complaints," as did the ALJ in this case.  <u>Moore v. Astrue</u>, 572 F.3d 520, 524 (8th Cir. 2009) (citation omitted).  In addition, the evidence of record concerning plaintiff's prescribed medications would not have weighed in her favor.  During her administrative hearing, plaintiff testified that her medications were effective and caused no side effects.  An impairment which can be controlled with medication or treatment is not considered disabling.  <u>Brown v. Barnhart</u>, 390 F.3d 535, 540 (8th Cir. 2004).  Plaintiff's testimony is not only unhelpful to her, it is inconsistent with her statement to Dr. Mannis that her medications "just make her sleepy" (Tr. 235).  Had the ALJ specifically discussed plaintiff's prescribed medications, he would most likely have reached the same conclusion regarding plaintiff's credibility.  "An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where, as here, the deficiency probably had no practical effect on the outcome of the case."  <u>Benskin v. Bowen</u>, 830 F.2d 878, 883 (8th Cir. 1987).

Review of the ALJ's credibility determination shows that, in a manner consistent with and required by <u>Polaski</u> and the Commissioner's Regulations, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies detracting from plaintiff's

credibility. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ acknowledged and considered the appropriate factors and gave several good reasons for discrediting plaintiff's subjective complaints, that decision should be upheld. Finch v. Astrue, 547 F.3d 933, 935-36 (8th Cir. 2008); Hogan, 239 F.3d at 962.

Plaintiff next challenges the ALJ's RFC determination, arguing that it is not supported by substantial evidence on the record as a whole. Plaintiff contends that the ALJ erroneously failed to find certain impairments severe at Step 2, and did not consider her severe and non-severe impairments in combination.

As will be discussed below, there is no error in the ALJ's Step 2 determination, and the ALJ's Step 2 findings therefore have no negative impact on his RFC determination. In his decision, the ALJ explicitly acknowledged his duty to consider "all of the claimant's impairments, including impairments that are not severe." (Tr. 11). After thoroughly summarizing the medical and other evidence of record, the ALJ wrote that plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment, and that he had determined plaintiff's RFC based upon the "entire record." (Tr. 15). This analysis is sufficient. "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) (citing Gooch v. Secretary of H.H.S., 833

F.2d 589, 592 (6th Cir. 1987)).

Plaintiff contends that the ALJ used a "boilerplate" format that suggests that he first formulated plaintiff's RFC, and then conformed his credibility assessment thereto. (Tr. 10-11). Citing <u>Bjornson v. Astrue</u>, 671 F.3d 640 (7th Cir. 2012), plaintiff suggests that the ALJ's decision is not supported by substantial evidence on the record as a whole due to this use of boilerplate or template language. Review of the ALJ's decision reveals no error.

Plaintiff correctly notes that the Seventh Circuit has criticized the boilerplate language that ALJs often use in their decisions. <u>Id.</u> at 646 ("The Social Security Administration had better take a close look at the utility and intelligibility of its 'templates'"). However, in <u>Bjornson</u>, the Seventh Circuit did not hold that the use of template or boilerplate language warranted reversal. <u>Id.</u> at 649 ("Whatever the cause, the administrative law judge's opinion failed to build a bridge between the medical evidence (along with Bjornson's testimony, which seems to have been fully consistent with that evidence) and the conclusion that she is able to work full time in a sedentary occupation provided that she can alternate sitting and standing"). In this case, the ALJ used some template language, but then provided several good reasons supporting his credibility determination. Despite the format of the ALJ's decision, it does not appear that the ALJ made the RFC determination before assessing plaintiff's credibility. Instead, as the Commissioner argues, the ALJ's decision is merely non-

linear, in that the ALJ set forth his finding first, and then set forth the analysis he used to arrive at that finding.  The format of the ALJ's decision does not render his analysis infirm.  As discussed above, the ALJ's findings are supported by substantial evidence on the record as a whole, and changing the format of the ALJ's decision would not change that.  Reversal is therefore not warranted.  Benskin, 830 F.2d at 883 ("[a]n arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where, as here, the deficiency probably had no practical effect on the outcome of the case").

Plaintiff also contends that the ALJ failed to provide evidence from a medical professional to support the RFC determination.  In support, plaintiff states that Dr. Mannis's opinion, in which he noted the lack of objective clinical findings to support work-related limitations, "predated most of the evidence of record, including the April 12, 2010 MRI's [[sic] which revealed, among other things, moderate central spinal stenosis at L4-5, (Tr. 368-9) multiple-level facet osteoarthritis at C2-5 and bilateral foraminal stenosis at C6-7. (Tr. 370)."  (Docket No. 15 at 16).  Plaintiff correctly cites the findings of the April 12, 2010 MRI.  However, Dr. Mannis's observation of a lack of objective clinical findings to support work-related limitations is consistent with medical evidence post-dating his opinion.  EMG and Nerve Conduction Velocity Examination of plaintiff's upper and lower extremities performed at Christian Hospital on March 29, 2010 for

evaluation of complaints of pain, numbness and tingling of the upper and lower extremities was normal. On May 21, 2010, June 10, 2010, June 18, 2010, and September 17, 2010, Dr. Bledsoe noted normal findings upon examination. Osteoporosis screening performed on May 27, 2010 at Northwest Healthcare was normal. On June 9, 2010, July 17, 2010, and September 26, 2010, emergency room treatment providers noted normal findings upon examination. Plaintiff also states that the ALJ failed provide the weight given to Dr. Mannis's February 15, 2010 opinion as required by 20 C.F.R. § 404.1527(e)(2)(ii). Plaintiff's statement provides no basis for remand. Dr. Mannis's opinion is not inconsistent with any other regarding determinative factors. According to 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2), if the medical opinions in the record are inconsistent with each other, the ALJ must weigh all the evidence. See 20 C.F.R. §§ 404.1527(d), 416.927(d); Hepp v. Astrue, 511 F.3d 798, 806-07 (8th Cir. 2008). However, if medical opinions are consistent, the ALJ need not weigh them. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1); Hepp, 511 F.3d at 806-07 (where examiners' reports were consistent with regard to the determinative factors, the ALJ was not required to identify the weight given). Here, because Dr. Mannis's opinion is not inconsistent with any other regarding determinative factors, the ALJ did not err in not providing the weight given. See Id. The ALJ in this case wrote that he had "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 417.927 and SSRs 96-2p, 96-5p,

96-6p, and 06-3p" (Tr. 15), exhaustively analyzed Dr. Mannis's opinion and set forth the findings in great detail, and wrote that a finding of disability was contrary to the bulk of Dr. Mannis's findings. The ALJ did not err in his treatment of Dr. Mannis's opinion, and plaintiff's assertions provide no basis for a finding that the ALJ's RFC determination is not supported by medical evidence.

Plaintiff states that the ALJ should have further developed the record and obtained a medical opinion. However, the record does include a medical opinion, that of Dr. Mannis, which was rendered after a consultative examination performed at the request of the Commissioner and, as discussed above, supports the ALJ's RFC determination. The fact that Dr. Mannis's opinion fails to support plaintiff's claims does not demand the conclusion that the evidence in the record was insufficient to support the ALJ's decision and the ALJ was obligated to further develop the record. There is no indication that the ALJ in this case felt unable to make the assessment he did. An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995). Plaintiff must, but has not, demonstrated that the ALJ failed to develop necessary evidence, and resulting unfairness or prejudice. See Haley v. Massanari, 258 F.3d 742, 749-50 (8th Cir. 2001).

Review of the ALJ's RFC determination reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole. Having reviewed the ALJ's decision with the requisite deference, the undersigned concludes that it is supported by substantial evidence on the record as a whole.

B.  Step 2 Findings

At Step 2 of the sequential evaluation process, the ALJ determined that plaintiff had the severe impairments of disorders of the spine, history of migraine activity, and hypertension. Plaintiff alleges that the ALJ failed to properly consider "myalgias, fibromyalgia, headaches, and chronic pain as severe medically determinable impairments at Step 2." (Docket No. 15 at 6). Having reviewed the ALJ's decision in light of plaintiff's arguments and the record, the undersigned determines that the ALJ's Step 2 findings are supported by substantial evidence on the record as a whole.

At Step 2, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. SSR 96-3p, 1996 WL 362204, *34469 (July 2, 1996). In Bowen v. Yuckert, after upholding the validity of Step 2's threshold severity requirement, the Supreme Court adopted a standard for its application which provides that "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be

denied benefits without undertaking" the subsequent steps of the sequential evaluation process. 482 U.S. at 158. It is plaintiff's burden to establish that her impairment or combination of impairments is severe. See Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). While severity is not an onerous requirement for the claimant to meet, it "is also not a toothless standard, and [the Eighth Circuit has] upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing." Id. (internal citation omitted).

First, as the Commissioner notes, the ALJ observed that plaintiff regularly sought treatment from Dr. Bledsoe for migraine activity, and found that history of migraine activity was a severe impairment. It therefore cannot be said that the ALJ failed to consider headache as a severe impairment.

Substantial evidence supports the ALJ's conclusion that myalgias and chronic pain were not severe. As noted above, the record contained ample evidence that plaintiff exaggerated such complaints, and that any genuine limitations on her ability to perform basic work activity was were slight. Thus, pursuant to the Regulations, such impairments are not severe. In addition, to the extent plaintiff can be understood to suggest that the ALJ should have determined that pain was a severe impairment, the undersigned notes that pain, while a symptom of a medically determinable impairment, it is not an impairment in and of itself. SSR 96-3p, 1996 WL 362204, *34469 (July 2, 1996).

Substantial evidence also supports the ALJ's conclusion that fibromyalgia was not a severe impairment. Plaintiff argues that she meets the criteria for fibromyalgia and, in her applications, she claimed that she became disabled in 2008 based in part on fibromyalgia. However, plaintiff's medical records contain no mention of fibromyalgia until she told the Christian Hospital emergency room treatment providers that her past history included fibromyalgia. (Tr. 360). Despite her report, no tenderness was observed upon examination. (Tr. 361); see Brosnahan, 336 F.3d at 672 n. 1 (a diagnosis of fibromyalgia is usually made after ruling out other conditions and "based on widespread pain with tenderness in at least eleven of eighteen sites known as trigger points.") When Dr. Rastogi noted in September 2010 that plaintiff had fibromyalgia, he appeared to do so based solely upon plaintiff's report. Dr. Rastogi did not identify trigger points or refer to what diagnostic techniques were used to confirm a diagnosis of fibromyalgia. See Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004) (affirming the ALJ's decision where, inter alia, trigger points were not identified to support claim of debilitating fibromyalgia). In similar fashion, the balance of plaintiff's medical records fail to refer to what, if any, diagnostic techniques were used to confirm a fibromyalgia diagnosis. See Id. Finally, as discussed above, the record contains substantial evidence to support the ALJ's conclusion that plaintiff exaggerated her complaints. As the Commissioner states, plaintiff is

essentially asking the Court to re-weigh the evidence and reach a different conclusion than that reached by the ALJ. This is not the role of this Court upon review. See <u>Jones ex rel. Morris</u>, 315 F.3d at 977 (citing <u>Davis</u>, 239 F.3d at 966 (where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome).

Plaintiff also claims that the ALJ failed to explain why he did not consider whether she met the criteria for pain disorder with psychological factors and what impact such disorder had on her RFC. However, the ALJ explicitly considered plaintiff's medically determinable mental impairments and found them to be non-severe, and this decision is supported by substantial evidence on the record as a whole. In making his Step 2 findings, the ALJ wrote that he had determined that plaintiff had no more than mild limitations in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (Tr. 15). The ALJ considered plaintiff's lack of mental health treatment, and the findings of Dr. Field who diagnosed plaintiff with pain disorder with psychological factors, but noted essentially normal findings upon examination and assessed a GAF indicative of mild symptoms with a reasonably good level of functioning. As a result, the ALJ concluded that plaintiff's medically determinable mental impairments/pain disorder with psychological features caused no more than minimal limitations.

Thus, pursuant to the Regulations, the ALJ had substantial evidence to conclude that such impairments were not severe. See Buckner, 646 F.3d at 557.

Plaintiff also claims that the ALJ failed to consider her advanced age and general deconditioning when determining her level of pain. While Dr. Field did opine that plaintiff appeared deconditioned and that this and the lack of activity may affect her focus upon pain, Dr. Field's ultimate assessment of plaintiff indicated that plaintiff had no more than mild limitations. Regarding plaintiff's age, plaintiff does not note, nor does review of the evidence reveal, evidence supporting a finding that plaintiff's age affected her pain. Further, as noted above, the ALJ properly discredited plaintiff's subjective allegations of pain after undertaking a legally sufficient analysis. Plaintiff also suggests that the ALJ should have considered the Commissioner's rules pertaining to persons of advanced age, and that the ALJ failed to ask the VE whether plaintiff acquired transferrable skills from her past work. Plaintiff states that these omissions potentially "foreshadowed a predetermined RFC to obviate the ALJ's duty to consider the 'special rules' for claimants of advanced age." (Docket No. 15 at 11). Plaintiff also suggests that the ALJ placed an improper burden of proof on her because, if he had properly considered her severe medically determinable impairments, credibility, RFC and age, then plaintiff would only need to prove herself incapable of performing jobs above the sedentary level.

Plaintiff's arguments are unavailing.  As discussed above, the ALJ in this case properly evaluated plaintiff's impairments at Step 2, properly assessed her credibility, and properly formulated her RFC. The ALJ considered testimony from a vocational expert who testified that an individual with plaintiff's limitations could perform plaintiff's past work as it is generally performed.  If an individual can perform her past relevant work, either as she performed it or as it is performed in the national economy, she is not disabled.  <u>Wagner</u>, 499 F.3d at 853 (internal citation omitted). In the hypothetical question posed to the VE, the ALJ included all of the limitations he found credible and supported by the record. Because the ALJ determined that plaintiff was able to return to her past relevant work, he was under no obligation to consider plaintiff's age or whether she had acquired transferrable skills.

Therefore, for all of the foregoing reasons, on the claims that plaintiff raises, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole, and should therefore be affirmed.  Because there is substantial evidence to support the decision, reversal is not required merely because substantial evidence may support a different outcome, or because another court could have decided the case differently.  <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir.2001); <u>Browning</u>, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision

be affirmed, and plaintiff's complaint be dismissed with prejudice.

The parties are advised that they have until July 5, 2013, to file written objections to this Report and Recommendation. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 21st day of June, 2013.